[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action to dissolve the marriage of the parties on the ground of irretrievable breakdown. Each party was represented by legal counsel. They presented evidence February 14, 15 and 20, 2002.
The more credible evidence leads to the following factual findings. The plaintiff, whose maiden name was Katherine Roy, and the defendant married August 16, 1986, at Hamden, Connecticut. They have resided in the State of Connecticut continuously for more than one year next before the date of the complaint. There are no minor children issue of the marriage. Neither party has received financial support during the marriage from the State of Connecticut or any municipality thereof. The marriage of the parties has broken down irretrievably.
The plaintiff wife holds a bachelor's degree in psychology and nursing and a masters degree in nursing. She will be 45 years old on March 18, 2002. Immediately after attaining her first nursing degree in 1981, the plaintiff worked as a nurse. The parties began dating in June, 1984, and began living together in September, 1984. In November, 1984, the plaintiff sought medical attention for her symptoms of a dragging right leg and double vision. The diagnosis was multiple sclerosis, a chronic and progressive disease of the nervous system characterized by muscular weakness and tremor. She applied for social security disability.
By the time the parties became engaged in June, 1986, the plaintiff had a staggering gait and carried a portable cane. She informed the defendant of the likely dire progress of her disease and the likelihood of her future confinement to a wheelchair. In the early 1990's, the plaintiff used a portable wheelchair. She began using an electric wheelchair at the beginning of 1996. By then she needed serious assistance in daily living, such as getting to bed and getting on and off the toilet. The defendant provided all of that assistance. If the plaintiff fell, she could not get up by herself. Nevertheless, this was the year that the plaintiff received her masters degree in nursing.
In 1997, the Connecticut Bureau of Rehabilitation Services adapted the parties' house for wheelchair use by adding ramps, a handicapped toilet, and lever-type doorknobs. In April, 1997, the parties' van came back to Connecticut after being handicapped-modified out-of state. The State of Connecticut met all of these expenses. CT Page 2682
As time went on and the disease progressed, more hands-on care was needed from the defendant. Each morning he would get his wife out of bed and to the toilet. He would shower her every other day or so. After caring for himself and the dog, the defendant would go to work. Upon returning home at 4:30 or 5:00 p.m., the defendant would take his wife to the toilet, take out the dog, fix supper, and then go out for evening appointments at his second job. Later he would take the plaintiff to the toilet and put her to bed. In 1998, the plaintiff suggested it was time for a home health aide. The defendant refused. He felt that this daily care was his responsibility as a husband and he was concerned about the cost of home health aides.
In January, 1999, the plaintiff went to see a lawyer to inquire as to her rights to her husband's inheritance. The attorney suggested marriage counseling; the plaintiff suggested marriage counseling to her husband. The parties had become angry and distant towards each other. The defendant resisted marriage counseling at first. However, he went to see his priest for advice and counseling about the prospect of divorce. The parties did see marriage counselors together starting in November, 1999, and continuing through July, 2000. The second marriage counselor recommended that the parties separate. The defendant refused a separation. In June, 2000, the defendant underwent surgery for a torn Achilles' tendon. At that point in time the parties were forced to hire home health aides. In August, 2000, the defendant broached to the plaintiff the prospect of divorce. The plaintiff commenced this action in October, 2000.
The parties separated in March, 2001, with the defendant's move-out from the house. The plaintiff continues to use home health aides in two daily segments of four hours apiece. The cost is $80 per day, seven days per week. The defendant having neglected to put the plaintiff on his medical insurance when the insurance changed in January, 2002, the plaintiff currently has no private medical insurance coverage. Medicare does not pay for prescriptions or home aides. The plaintiff's prescriptions cost about $2,000 per month. Aside from ordinary living expenses, the plaintiff periodically incurs the expenses of repairs to her modified van and to her wheelchair.
The plaintiff's income is derived from social security disability in the amount of $800 per month ($185 per week), less the cost of Medicare Part B ($12 per week). As of March 1, 2002, the plaintiff expects to start a minimum-wage job at WalMart as a greeter 20 hours per week. This will render her eligible for the new Connecticut Medicaid for the Employed Disabled program. Under that program the state will pay for home health aides, medical care, prescriptions and personal hygiene supplies, such as those needed for incontinence. The plaintiff may retain all of CT Page 2683 her wages, but must keep no more than $10,000 in liquid assets, as such assets are defined by the program eligibility standards.
The defendant husband holds a college degree and will be 47 years old as of March 21, 2002. His primary employment is as a salesman for AdCom. In addition, he is a licensed insurance and investments advisor. He has secondary employment as an independent contractor with Primerica. Through both jobs his present earnings are about $37,500 per year ($721 per week). In light of the present economy, the defendant is working to his maximum current earning capacity. Although the defendant suffers from asthma, his condition is under control and is not debilitating. He describes no lingering ill effects after the June, 2000 surgery for a torn Achilles' tendon.
It was through his work as an investment adviser that the defendant began seeing Alexandra Tredennick in July, 2000. She had been a high school sweetheart. The relationship quickly took on romantic connotations. He sent flowers to Tredennick on August 9, 2000. On August 26, 2000, the defendant told the plaintiff that he wished a divorce. The defendant states that the timing of his relationship with Tredennick and his desire for a divorce was entirely coincidental because the romance with Tredennick did not begin until September, 2000. His intimate relationship with Tredennick was postponed until January, 2001, and, in any case, was not adultery because his marriage was no longer viable. This is specious reasoning at best.
Despite the defendant's recent culpable behavior in wooing Tredennick, the marriage was on its way to irretrievable break-up long before July, 2000. The progress of the plaintiff's disease frustrated both parties. The defendant's role shifted progressively from that of a husband to that of a caretaker. Financial difficulties were a constant source of worry. Although the defendant blames the plaintiff for running up credit card bills and unpaid debts in recent months, the court can find no unnecessary or exorbitant expenses by either party in the course of the marriage. Assets have been spent down by each party only for customary and usual household expenses and reasonable attorneys' fees. The court finds the parties' unavoidable circumstances, rather than either party, to be primarily at fault in the breakdown of the marriage.
The parties held the following assets and debts at the time of the dissolution trial:
A. Defendant's Assets
1. Three (3) checking accounts with negligible value CT Page 2684
 2. AIM Global Aggressive Growth Fund — Class B valued at $23,250 minus the March, 2002 temporary alimony payment. This is the remainder of an inheritance from the defendant's aunt. The inheritance from the defendant's parents has already been spent down for household needs of the parties.
 3. Five (5) IRA's valued at $32,768. About $10,500 of this is inherited from the defendant's aunt.
4. A receivable of $4,000 from a loan to a friend
B. Plaintiff's Assets
1. Three (3) checking accounts valued at $806
2. An electric wheelchair with no specified value
C. Joint Assets
 1. 1989 Lincoln Continental valued at $1,500, driven by the defendant
 2. 1996 Ford Windstar van valued at $15,000, driven by the plaintiff
 3. Residence at 19 Alexander Dr., Meriden, Ct., with equity of $28,000
 4. A strand of pearls and a diamond pendant necklace, both from the defendant's family
5. Miscellaneous furnishings at the residences of both parties
D. Defendant's Debts
1. Legal costs for this action approx. $1,000
2. Center of Orthopedics $2,400
3. MBNA MasterCard $300
4. Civali's $300
E. Plaintiff's Debts
1. Legal costs for this action approx. $15,000 CT Page 2685
2. Medical bills $1,324
3. House painting $2,000
4. Wheels, Inc. $1,500
5. Car repairs $1,335
6. Home health aides $7,000
7. VISA Aspire $5,000
8. Wachovia VISA $1,550.
F. Joint Debts
1. Citibank MasterCard $16,804
 2. Both parties are obligated on the residence mortgage (approx. $101,000 balance).
The court has considered all the criteria in General Statutes §§46b-62, 46b-81 and 46b-82 in light of the evidence presented. The following are the orders of the court:
1. The marriage of the parties is dissolved and they are each declared to be single and unmarried.
2. The defendant shall pay spousal support to the plaintiff in the amount of $165.00 per week commencing April 1, 2002.
3. The defendant shall maintain life insurance on his own life naming the plaintiff as sole beneficiary in the amount of no less than $300,000 so long as an alimony obligation continues.
4. Each party shall be responsible for his or her own medical expenses incurred in the past as well as in the future.
5. The defendant shall forthwith quitclaim to the plaintiff all of the defendant's right, title and interest in and to the real property at 19 Alexander Drive, Meriden. The plaintiff shall have exclusive possession of the said real property. She shall indemnify and save the defendant harmless as to all mortgage, tax and insurance costs at the real property, as well as all expenses of utilities, maintenance, capital expenditures, repairs and upkeep at the real CT Page 2686 property.
6. The defendant is awarded $28,000 of equity in the real property at 19 Alexander Drive, Meriden in the form of a promissory note to be executed by the plaintiff as maker in favor of the defendant as holder and secured by a second mortgage on the real property. The note shall earn no interest. It shall become due and payable upon the death of the plaintiff; the permanent change in residence of the plaintiff away from the real property; the sale of the real property; or the delinquency in payment of the first mortgage, real property taxes, and homeowners insurance totaling $3,000 or more, whichever event shall occur soonest. The note and mortgage deed shall be prepared at the expense of the defendant and shall be recorded on the land records at the expense of the defendant.
7. The plaintiff shall forthwith transfer to the defendant all of her right, title and interest in and to the 1989 Lincoln Continental automobile. The defendant shall transfer forthwith to the plaintiff all of his right, title and interest in and to the 1996 Ford Windstar van. Each party shall save the other harmless as to all taxes, costs and expenses associated with his or her own motor vehicle after the transfers.
8. The plaintiff shall establish an Individual Retirement Account in her own name forthwith. The defendant shall thereafter immediately cause to be transferred to the administrator of the plaintiff's IRA all the current value of his five (5) IRA's shown on his financial affidavit of February 14, 2002.
9. The defendant shall retain the MM Global Aggressive Growth Fund, the $4,000 loan receivable, the life insurance policy on the life of the plaintiff, the pearl necklace, and all checking accounts in his own name.
10. The plaintiff shall retain the electric wheelchair, the diamond pendant necklace and all checking accounts in her own name.
11. By way of additional lump sum property settlement, the defendant shall make the following direct payments to creditors:
 a. $4,800 to the holder of the first mortgage of the real property at 19 Alexander Drive, Meriden, Connecticut on or before March 31, 2002, representing prepayment of that mortgage.
b. $1,500 to Wheels, Inc. on behalf of the plaintiff on or before April 30, 2002. CT Page 2687
 c. $2,000 to the house painter on behalf of the plaintiff on or before April 30, 2002.
12. By March 31, 2002, the defendant shall pick up from the real property at 19 Alexander Drive, Meriden, Connecticut two (2) desks, his personal files and records, and the crucifix from his mother's casket. Each party shall retain all other items of tangible personal property now in his or her own possession.
13. The defendant shall assume sole responsibility for payment of the outstanding joint debt to Citibank MasterCard. He shall indemnify and save harmless the plaintiff from that debt.
14. All other debts of the parties, not specifically addressed in these orders, shall be allocated solely to the party on whose financial affidavit they appear.
15. The defendant shall pay to the plaintiff's attorney directly the sum of $5,000 against the plaintiff's counsel fees for this action. Payment shall be made on or before April 30, 2002.
Winslow, J.